**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CHARLES BETHEA,

        Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Civil Action No. 13-cv-3961 (PGS)

OPINION AND ORDER

SHERIDAN, U.S.D.J.

    This matter is before the Court on Charles Bethea's (Plaintiff) appeal of the decision of the Commissioner of Social Security denying his application for period of Disability Insurance Benefits.  On March 11, 2010 Plaintiff filed his claim for disability and disability insurance benefits alleging disability due to injuries to his shoulder and back, hypertension, venous thrombosis, and a learning disorder. (R. 73-5, 183, 275).  Plaintiff alleges onset of his disability as of February 13, 2008, the date on which Plaintiff was struck by an automobile.

    On January 12, 2012, Administrative Law Judge Frederick Timm (ALJ) issued a partially favorable decision of disability for a closed period of April 17, 2009 to August 6, 2010 due to deep vein thrombosis (DVT).[1] (R. 19-46).  The issues presently before the Court are (1) whether substantial evidence supports the Commissioner's decision that Plaintiff was not disabled from his alleged onset date of February 13, 2008 through March 31, 2009; and (2) whether substantial evidence supports the Commissioner's decision that Plaintiff was no longer disabled as of August

---

[1] The Administrative Law Judge found that Plaintiff had not acquired sufficient coverage until April 17, 2009, and for supplemental security income until May 2009.  (T. 23).

1

7, 2010, the date on which the ALJ found Plaintiff's condition had medically improved to the extent he was no longer disabled.

I.

On August 8, 2011, a hearing was held before the ALJ at which time the Plaintiff testified on his own behalf.  At the time of the hearing, Plaintiff was 38 years old and was living with his sister.  Plaintiff testified that he prepares meals for his family, cleans the house and can vacuum for about twenty minutes.  Plaintiff testified that after about twenty minutes his leg begins to burn, and he must rest for at least fifteen minutes with his leg elevated.  Plaintiff testified that on most days, the majority of his time is spent playing video games.

Plaintiff attended Trenton High School through the ninth grade and dropped out before completing tenth grade. (R. 275). After quitting high school, Plaintiff resided with his grandmother and resumed his schooling at Lawrence Township High School.  While attending Trenton High School and Lawrence Township High School, Plaintiff was classified as "perceptually impaired" and was enrolled in special education classes.  (R. 436).

On February 13, 2008, Plaintiff was struck by a car while walking to work and was taken to Capital Health System for treatment (the treatment is discussed below).  Plaintiff testified that as a result of the accident he suffered a couple of "cracked" ribs, his lungs had pulled away from the chest wall, his shoulder and head were hurt, and his femur was "cracked."

Plaintiff worked at KFC on a part time basis after the accident. Plaintiff's supervisor asked him if he would like to become a cook, and he was advised that the job would require some training. Plaintiff testified that he "started messing up on purpose" because he doesn't read well, and was nervous about attending the training. (R. 56). The Plaintiff testified that at the present time he was doing odd labor jobs on a limited basis. (R. 68). The Plaintiff testified that on a good week he gets

work two times a week and helps out a friend that does "junking." Plaintiff testified that he tries to find jobs that allow him to take breaks, such as five minutes to walk around and get water when needed. Plaintiff testified that since his accident in 2008, he can only stand up for about twenty minutes before his leg buckles and a burning sensation occurs in the front of his calf. He also testified that he cannot lift as much as he could previously, and that before the accident he was employed as a "mule" because he could lift and pull things such as carrying 200 pound logs on his shoulder. He testified that now he can only lift about fifty pounds.

Plaintiff testified that he was being treated by a pain management doctor for his leg and shoulder and that he had been taking Coumadin for the past three years to treat his DVT. Plaintiff testified that his leg is constantly swollen since the accident, and that some days his feet swell and he cannot wear shoes. On the day of the hearing the Plaintiff testified that his feet were swelling, and he had on his largest shoes, and he was in pain. The Plaintiff testified that he treats his pain with Aleve. The Plaintiff also testified that he is under psychiatric treatment because at some point his girlfriend died, and he stopped caring and began sleeping in abandoned houses.

As noted above, on February 13, 2008 Plaintiff was struck by a car while walking to work. Plaintiff was taken to Capital Health System for treatment. At the time of treatment he appeared alert and hemodynamically stable. (R. 295-6). He complained of left leg pain and right shoulder pain. A CT scan of the Plaintiff's chest showed a small, subclinical right anterior pneumothorax, and a minimally displaced fracture of the proximal left fibula-linear simple fracture. A CT scan of the abdomen and pelvis showed a very small, right sided pneumothorax, and the lung fields demonstrated bilateral lower lobe dependent atelectatic changes. (R. 306).

On February 14, 2008, Plaintiff was seen by Dr. Raja Salem of Capital Health Systems. Dr. Salem found Plaintiff was in no acute distress, and his right shoulder appeared stable and there

were no breaks in skin or discoloration. Tenderness was found on the scalp and shoulder area. Dr. Salem prescribed crutches and approximately six weeks of healing time for the fracture of the fibula. Ice and analgesics to the area were recommended. It was recommended that Plaintiff attend physical therapy after the fracture healed.

On May 9, 2008, x-rays of Plaintiff's tibia and fibula were taken at Capital Health Center's radiology department. Dr. Andrew Kim compared the x-rays from February 13, 2008 and found that the fracture of the proximal fibula had an increase in callous formation. (R. 318).

On August 11, 2009, Plaintiff visited the Capital Health System Emergency Department. Dr. Meisner examined Plaintiff for his complaints of pain and swelling in his left leg that had not subsided since his accident in February of 2008. (R. 332). Dr. Meisner diagnosed Plaintiff with chronic DVT in his superficial fermoral and popliteal veins. (R 333). There was also evidence of a chronic superficial clot at the left saphenofemoral junction. The Plaintiff was discharged with instructions to follow up at the medical clinic for treatment.

On December 8, 2009, Plaintiff was seen by Dr. Francky Merlin for a consultative examination. (R. 334). At the time of the evaluation, Plaintiff reported being hit by a car causing blood clots, and swelling in his leg. On examination, Plaintiff's respiration and vision were good, and he had no difficulty arising from a sitting position or getting on or off the examination table. His blood pressure was 124/92. His grasping strength and manipulative functions were not impaired; and range of motion from his shoulders to his ankles was good. At the time of the evaluation, he was taking no medications. Dr. Merlin found Plaintiff suffered with hypertension and DVT. (R. 226).

On December 30, 2009, Plaintiff went to the Capital Health System Emergency Department complaining of severe pain and swelling in his left leg. The Plaintiff was diagnosed with DVT and dyspnea. (R. 344).

On April 13, 2010, Plaintiff was admitted to Bayhealth Medical Center for one week. An ultrasound showed extensive DVT in the superficial femoral vein. (R. 376, 380). The Plaintiff was immediately admitted for evaluation and treated with heparin. (R. 376). He was released a week later (April 21, 2010) with instructions to return to the clinic to receive Coumadin. (R. 377).

On June 23, 2010, the Plaintiff was treated by Dr. Iftekhar Khan of Hematology/Oncology Associates. (R. 420). He continued to have chronic swelling of the calf, and noted that he was regularly treating with Coumadin at the clinic. (R. 421). A hypocoagulable workup was done to determine the reasons for his DVT. Dr. Khan recommended that Plaintiff return in October for further testing. Plaintiff was prescribed a Jobst® support stocking to treat the swelling in his calf.

On August 6, 2010, Plaintiff was treated by Dr. Fanta V. Morgan of Delaware Podiatric Medicine to evaluate Plaintiff's left foot and ankle pain. (R. 422). On examination, it was found that the vascular status of Plaintiff's lower extremities was normal, as was Plaintiff's neurological exam. Plaintiff had some left ankle pain on palpation and with range of motion. Plaintiff's left ankle was positive for edema. Dr. Fanta diagnosed Plaintiff with a left ankle sprain, placed his ankle in a brace, and x-rays were ordered. X-rays of the left foot showed mild osteophyte formation in the anterior tibiotalar joint, but no acute abnormality was found. (R. 425).

On July 25, 2011 Plaintiff treated with Emily Chen, M.D. Dr. Chen noted Plaintiff's ongoing DVT treatment and recommended continuation of Coumadin.[2] (.R 435).

---

[2] Dr. Chen also noted that Plaintiff had a previous gunshot wound which had been successfully treated with a small intestine partial gastrectomy.

Residual Functional Capacity Assessment

On January 19, 2010, a Residual Functional Capacity Assessment was performed by Joseph Michel, medical consultant. The assessment found Plaintiff could lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks for a total of six hours; sit (with normal breaks) for about six hours in an eight hour work day; push and/or pull (including operation of hand and/or foot controls) unlimited; and Plaintiff could occasionally climb, stoop, kneel, crouch and crawl.  In addition, Plaintiff had no manipulative, visual or communicative limitations, but he had one environmental limitation which was to avoid concentrated exposure to fumes, odors and hazards. (R. 373).

The ALJ's Opinion

On January 12, 2012, the ALJ issued a Partially Favorable Decision of disability for a closed period of April 17, 2009 to August 6, 2010 due to DVT.[3] However, after further considering of all the evidence, the ALJ concluded that Plaintiff's condition of DVT had medically improved with Coumadin treatment, and that beginning August 7, 2010 Plaintiff retained the residual functional capacity to perform sedentary, unskilled work with the limitation that he should avoid concentrated exposure to hazards.

II.

*Standard for Determining Disability*

A claimant is considered disabled under the Social Security Act if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which  "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  A plaintiff will not be considered disabled unless he

---

[3] As noted above, the onset date was based on the date when Plaintiff had acquired sufficient quarters of coverage to be insured for purposes of Title II benefits from April 17, 2009 through June 30, 2015.

cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2)(A); *see Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  The Act requires an individualized determination of each plaintiff's disability based on evidence adduced at a hearing.  *Sykes*, 228 F.3d at 262 (citing *Heckler v. Campbell*, 461 U.S. 458, 467 (1983)); *see* 42 U.S.C. § 405(b).

The Social Security Administration has developed a five-step sequential process for evaluating the legitimacy of a plaintiff's disability.  20 C.F.R. § 404.1520.  Since all of the parties agree that the Court followed the five step process, each step is not reviewed herein.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record.  42 U.S.C. § 405(g).  *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla.  *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422.  Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9.  The reviewing court must view the evidence in its totality.  *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence B particularly certain types of evidence (e.g., that offered by treating physicians) - - or if it really constitutes not evidence but mere conclusion.

*Morales*, 225 F.3d at 316 (citing *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)); *see also Benton v. Bowen*, 820 F.2d 85, 88 (3d Cir. 1987). Nevertheless, the district court's review is deferential to the ALJ's factual determinations. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (en banc) (stating district court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder"). A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales*, 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.* requires that the claimant provide objective medical evidence to substantiate and prove his or her claim of disability. *See* 20 CFR § 404.1529. Therefore, claimant must prove that his or her impairment is medically determinable and cannot be deemed disabled merely by subjective complaints such as pain. "A claimant's symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); *Hartranft*, 181 F.3d at 362.

III.

Plaintiff has four primary arguments which are the basis of his appeal.

First, Plaintiff argues that the ALJ erred in denying benefits to Plaintiff due to his mental impairment (learning disability). Plaintiff's counsel argues that an IQ test score of 59 or less is required in order to meet the requirements for listing 12.05, subsection (B); but since no IQ test score is found in the record, the ALJ should have ordered that a consultative psychological examination take place where an IQ test could be administered to determine if Plaintiff met the standard. However, the ALJ found that a consultative psychological examination was not necessary because Plaintiff's school records showed that Plaintiff had a "low average" range of intelligence, and no other testing was required. The Court disagrees with Plaintiff's argument.

List 12.05 (Mental Retardation[4]) of 20 CFR Part 404, Subpart P, Appendix 1 (the "listings") includes an introductory paragraph which sets forth the diagnostic description of mental retardation. Subsection B(1) of the listing (upon which Plaintiff relies) provides that an IQ of 59 or less be found to satisfy the requirement of that listing. However, a fair reading of listing 12.05 shows that subsection B(1) refers back to the introductory paragraph. The introductory paragraph reads:

> Mental retardation refers to <u>significantly subaverage general intellectual functioning</u> with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. (emphasis added).

---

[4] On August 1, 2013, the Social Security Administration replaced the term "mental retardation" with "intellectual disability" in their Listing of Impairments (12.05) used to evaluate claims involving mental disorders in adults and children. This change reflected the widespread adoption of the term "intellectual disability" by Congress, government agencies, and various public and private organizations. For purposes of this memorandum, listing 12.05 is quoted as it appeared at the time of the ALJ's opinion.

The ALJ interpreted the school record to mean that Plaintiff's "low average" intelligence was a higher score than the "significantly subaverage general intellectual functioning" required by the introductory paragraph of the listing.  This is a reasonable interpretation, as one could circumstantially find that a child study team would correctly find the appropriate intellectual functioning range through testing.  When reviewing the ALJ's opinion on the learning disorder, and the ALJ's in-depth analysis, the ALJ's conclusion is reasonable.

Second, Plaintiff argues that the ALJ erred in failing to apply the correct standard to show medical improvement.  Generally, "[w]hether medical improvement has occurred is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. § 404.1579a(c)(1)(emphasis added).  Plaintiff bases his argument on the ALJ's findings that "[t]he undersigned notes that the plaintiff testified that he worked at Kentucky Fried Chicken and he performed odd jobs after August 6, 2010" and "the plaintiff's work history does not add to the persuasiveness of the plaintiff's subjective complaints and alleged limitations." Plaintiff seems to argue that the ALJ only used Mr. Bethea's work history as the standard to show medical improvement. Although the ALJ referred to Plaintiff's work history, the ALJ also clearly relied on medical evidence to find, first, that Plaintiff was entitled to a period of disability benefits, and second, that Plaintiff's vascular condition (DVT) had medically improved. More specifically, the ALJ found that beginning in April 2009, Plaintiff's DVT was a severe impairment and Coumadin was being used to treat and relieve Plaintiff's symptoms of DVT.  The ALJ then noted that on August 6, 2010, Dr. Fanta Morgan examined Plaintiff and opined that Plaintiff's "vascular status pertaining to his lower extremities was normal." (R. 422.)  Dr. Morgan further noted that Plaintiff's neurological examination was unremarkable and that his orthopedic

exam was positive only for left ankle sprain. Additionally, the ALJ observed that Plaintiff did not require hospitalization for DVT as he had in the past and that he did not undergo treatment for deep vein thrombosis for 15 months from April 13, 2010 to July 25, 2011. Relying on 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1), the ALJ proceeded to find that Plaintiff's disability had ceased on August 7, 2010, because his medical condition allowed him to perform unskilled sedentary work as defined in 20 C.F.R. §§ 404.1567(a), and 416.967(a), except that he must avoid concentrated exposure to hazards.

To the Court, the ALJ applied the correct standard for showing medical improvement by referring to credible medical findings, and Plaintiff's argument therefore lacks merit.

Plaintiff's third argument is that the ALJ erred by assigning both little weight and great weight to the same non-examining State Agency Medical Report. Plaintiff's entire argument is contained within two short paragraphs. It reads:

> The ALJ erred in assigning both little weight and great weight to the same non-examining State Agency Medical Consultant reports. Related to the above, the ALJ determined that the opinions of the non-examining State Agency Medical Consultants (SAMCs) were both entitled to little weight, as the opinions "are contrary to the weight of the medical evidence of record," (AR 35), and entitled to great weight, "as they are consistent with the medical record as a whole." (AR 40). Like the ALJ's determinations of RFC and credibility, it is submitted that these incompatible findings are evidence that the ALJ's decision is not supported by substantial evidence, and is instead, evidence of an attempt to somewhat artificially carve out a later onset date and end date to the Plaintiff's chronic functional limitations. As such, the case should be remanded for further consideration

As the argument presents little detail or analysis, the Court finds no reason to comment.

Plaintiff's final argument is that the ALJ erred in his credibility determination of Plaintiff. Plaintiff's counsel argues that the ALJ compared Plaintiff's testimony only to certain objective evidence, as opposed to Plaintiff's overall medical condition, and that the ALJ should have considered the entire record in determining credibility. To demonstrate this point, Plaintiff relies on two paragraphs from the ALJ's opinion. They are:

> The undersigned concludes that the absence of objective evidence in this case in conjunction with the claimant's reported elevated pain levels, which mirror complaints of those individuals having significantly more pathology in their imaging studies, objective evaluations, and lab test results, casts doubt on the claimant's testimony about the limited nature of his functional abilities secondary to his leg pain. <u>Therefore, the credibility of the claimant's testimony about the extent and severity of his impairment, in the face of such findings, has been reduced accordingly. To consider the claimant's status post fibula fracture, the undersigned assigned a medium exertional level</u>.
>
> ***
>
> <u>As a result, the objective evidence fails to document the presence of any impairment or combination of impairments that could reasonably be expected to result in pain or other symptoms of such a severity or frequency as to preclude the claimant's residual functional capacity as assigned.</u> (T. 33 emphasis added.)

The two paragraphs quoted above are taken out of context and do not adequately represent the ALJ's reasoning for making his credibility determination.  The quoted language is from section five of the ALJ's opinion wherein the ALJ considered the entire record and found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. For example, Plaintiff alleged hypertension as a cause of his disability.  The ALJ noted Plaintiff's blood pressure at the time of the consultative examination as being 117/63 (normal), and noted that there was no long history of hypertension.  Plaintiff alleged hypertension as cause of his disability.  In light of same, the ALJ correctly diminished the impact of Plaintiff's

hypertension. The ALJ also considered Plaintiff's status post left fibula fracture, and shoulder and head injury. He included a discussion of the February 13, 2008 imaging study of Plaintiff's left lower extremity which revealed a minimally displaced fracture of the proximal left fibula (a simple fracture). Certainly, the imaging study findings gave rise to the ALJ's credibility assessment of Plaintiff in his assertion that he cannot stand for more than twenty minutes. It is well within the discretion of the Commissioner to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology. *LaCorte v. Bowen*, 678 F. Supp. 80, 83 (D.N.J. 1988); *Brown v. Schweiker*, 562 F. Supp. 284, 287 (E.D. Pa. 1983).

The ALJ must also consider intensity and persistence of pain or symptoms. The ALJ used the following standard:

> Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the medical evidence of record, the undersigned must make a finding on the credibility of those statements based on a consideration of the entire case record.

It was the ALJ's finding "that after considering both the subjective and objective evidence of record . . . . the undersigned finds that although the claimant's stated symptoms are attributable to his medically determinable and severe impairments as found above, the intensity, persistence, and limiting effects of those symptoms on his work-related abilities are not as restrictive as the claimant asserts."

V.

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. 42 U.S.C. § 405(g); s*ee also Morales,* 225 F.3d at 316; *Hartranft*, 181 F.3d, 360; *Doak*, 790 F.2d at 28.  The ALJ correctly noted that since the alleged onset date of disability, February 13, 2008, Plaintiff had the following severe impairments: hypertension, status post fibula fracture and learning disorder. (20 CFR 404.1520(c) and 416.920(c)).  However, none of Plaintiff's impairments met or medically equaled the severity of one of the listed impairments in 20 CFR §§ 404, Subpart P, Appendix 1(20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.  In making that determination, the ALJ considered the listings contained at Sections 1.00 (musculoskeletal system disorders), Sections 4.00 et seq. (cardiovascular system disorders), and Section 12.05 (mental retardation) and found that the precise criteria of the listings were not been met.  The ALJ noted that not even Plaintiff's attorney had argued that a listing has been met or equaled. Moreover, no physician had mentioned any findings equivalent in severity to any listed impairment, nor are such findings indicated or suggested by the evidence of record.

Looking at the record as a whole, the ALJ found the medical evidence did not "substantiate the severity of the pain and degree of functional limitations alleged by plaintiff."  In addition to the reliance on the medical opinions of Drs. Morgan, Chen and Merlin, the ALJ's conclusion seems reasonable especially in light of the fact that at the December 8, 2009 consultative examination, Plaintiff was not taking any medications for pain; and testified that he was self-treating with Aleve for pain.

The ALJ's decision is based on substantial evidence. 42 U.S.C. § 405(g).  *See Morales,* 225 F.3d at 316; *Hartranft,* 181 F.3d at 360;  *Sykes*, 228 F.  3d at 266 n. 9.   The decision of the Commissioner is affirmed, and the complaint is dismissed.

### ORDER

This matter having come before the Court upon the appeal of Plaintiff Charles Bethea from the Commissioner of Social Security Administration's final decision denying his application for Disability Insurance Benefits; and the Court having considered all submissions of the parties; and in light of the reasons stated above;

It is on this 23rd day of September, 2014,

ORDERED that the final decision of the Commissioner of Social Security is affirmed.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.